UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEBORAH PALANTI, ) | |
| ) | |
| Plaintiff, ) | Case No. 23-cv-2365 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| LAWBLE, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM OPINION AND ORDER**

One of the first decisions that a defendant has to make in a lawsuit is whether to hire a lawyer. Sometimes defendants retain counsel to respond to a lawsuit, and sometimes they go solo. That decision is especially tricky for defendants when the lawsuit is about the failure to pay bills. After all, a debtor-defendant might not have the money to pay for a lawyer, either.

Deborah Palanti faced that dilemma when a debt collector sued her in state court about her unpaid bills. At first, Palanti didn't hire an attorney. But she didn't exactly go it alone, either. Instead, she signed up for an online service that automatically generates and files answers for *pro se* litigants. The service is called, aptly enough, SoloSuit. It's like TurboTax for lawsuits.

SoloSuit generates answers to complaints through a fill-in-the-blanks process, based on responses that a user gives to a list of questions. A debtor-defendant simply goes to SoloSuit's website, and provides a bunch of information. And then, with the click of a button, SoloSuit kicks out an answer to the complaint and later files it in state court.

Palanti decided to go solo, with the help of SoloSuit as her guide. She went to the website, paid for the service, and answered the questions. She did everything that she needed to do. At that point, she had all of her bases covered.

Or so she thought. Palanti later received an unwelcome surprise. At some point, she came to learn that SoloSuit didn't file an answer on her behalf at all. So Palanti sprang into action, retained a lawyer, and answered the complaint. Fortunately for Palanti, the state court did not enter a default judgment against her.

Palanti later filed this lawsuit about SoloSuit's failure to help her in the state court lawsuit. She sued Lawble, Inc., the company that does business as SoloSuit, as well as the company's two founders. She claimed that SoloSuit had misrepresented its services in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

This time, Palanti didn't go it alone. She filed a class action, seeking to represent all buyers who used SoloSuit in Illinois. She alleges that members of the putative class – unlike Palanti herself – might have a default judgment entered against them.

Palanti originally filed the case at hand in state court. But Defendants removed the case to federal court under the Class Action Fairness Act. Palanti, in turn, filed a motion to remand, arguing that the case does not satisfy the amount-in-controversy requirement.

For the reasons stated below, the motion to remand is denied.

## Background

SoloSuit tries to answer a question that millions of Americans face when debt collectors slap them with a lawsuit: How do you answer a complaint?

SoloSuit is an online service that automatically generates an answer to complaints filed in debt-collection lawsuits. SoloSuit describes itself as an "online provider of legal 'fill in the

blank' forms and general legal information." *See* Cplt., at ¶ 18 (Dckt. No. 1-1). The website offers help to debtors who want to fight back. "Beat debt collectors / Get the legal help you need to win against debt collectors. Our automated software will help you successfully fight collectors." *Id.* at ¶ 8.

Basically, users go to the SoloSuit website and answer a bunch of questions. *See SoloSuit FAQ*, SoloSuit (Dec. 5, 2023), https://www.solosuit.com/posts/solosuit-faq (last accessed Jan. 8, 2024). At that point, the system generates a response to the complaint.

SoloSuit's website describes the process. "Every year, 10 million Americans are sued for a debt. 90 percent of them lose by default because they can't figure out how to respond and they only have 14-30 days to respond. [ ] This is where SoloSuit comes in! [ ] SoloSuit asks a few simple questions about your case. Based on your answers, SoloSuit prepares a response and instructs you on how to file. Responding to a lawsuit is the first step in defending yourself. SoloSuit can help you take that step and guide you to additional resources when you're done." *See* Cplt., at ¶ 9 (Dckt. No. 1-1, at 16 of 136).

Users can get additional services by selecting the so-called "premium package." *Id.* at ¶ 15. The premium package comes with attorney review of the answer. *Id.* The response "will be reviewed by a professional debt-collection attorney to make sure everything looks good before filing. If they recommend changes we will let you know." *Id.* at ¶ 15. If a user pays for the "premium package," then SoloSuit will transmit the answer to the court for filing and will pay the filing fee, too. *Id.* at ¶ 16.

As you might expect, the website is chock-full of disclaimers. The website says that SoloSuit "is not a law firm and we do not provide legal advice or represent you in any way." *Id.* at ¶ 18. "By using this web app or our legal forms, you are not accessing attorney services or

legal advice, *unless you purchase the Premium Option which includes review of your completed form by an independently contracted attorney*. SoloSuit's services, including our web app, our legal forms, and any information we provide, are not a substitute for the advice of an attorney." *Id.* (emphasis added by Palanti in the complaint).

Additional fine print repeats the disclaimer. "SoloSuit is not an attorney or a law firm. Nor is it a substitute for an attorney or law firm. We do not provide legal advice nor do we practice law. This site only contains legal information, not legal advice. SoloSuit is a self-help tool. This site does not create an attorney-client relationship. We provide no guarantee regarding case outcomes nor are we liable for any case outcomes. Use of its products are governed by its Terms of Service, Privacy Policy, and Legal Disclaimer." *Id.* at ¶ 19.

Another paragraph says that SoloSuit cannot guarantee the enforceability or validity of the documents that it generates. *Id.* "Different states have different rules that may affect the enforceability or validity of answers, and each state's laws may change over time." *Id.* at ¶ 18. And so on.

In 2022, a debt collector sued Deborah Palanti for failure to repay a consumer loan. *See* Cplt., at ¶ 10 (Dckt. No. 1-1). Palanti decided to turn to SoloSuit for help. *Id.* at ¶¶ 14–15.

Palanti paid the fee, answered the questions on the website, and arranged for the preparation of an answer. She also paid extra for the "premium package." *Id.* at ¶ 15. At that point, Palanti thought that she had done all that she needed to do.

Unfortunately for Palanti, SoloSuit never filed the answer at all. *Id.* at ¶ 23. It looks like SoloSuit did, in fact, generate an answer. Palanti attached a copy of the draft answer as an exhibit to the complaint at hand. *Id.* at ¶ 22; *see also* Answer (Dckt. No. 1-1, at 88 of 136). But for whatever reason, SoloSuit never filed it. *See* Cplt., at ¶ 23.

4

At some point, Palanti got wind of the fact that SoloSuit never filed an answer. She checked the state court website, and noticed that no answer was on file. So Palanti retained counsel. *Id.* at ¶ 27. Her attorney is, by all appearances, actively litigating the case against her in state court. The docket shows a pending motion to compel arbitration. *See* State Court Docket (Dckt. No. 1-1, at 35 of 136).

Palanti ultimately filed a lawsuit of her own in state court. *See* Cplt. (Dckt. No. 1-1). She sued Lawble, Inc. – which does business as SoloSuit – and co-founders George Simons and Scott Erickson. *Id.* at ¶¶ 3–5. (This Court will refer to Lawble, Inc. as SoloSuit for ease.)

Palanti filed the complaint on behalf of herself and a putative class of all people sued in Illinois who used SoloSuit to prepare legal responses to debt-collection lawsuits in a three-year period. *Id.* at ¶¶ 43–44. She included a subclass of users who purchased the premium package (like she did). *Id.* at ¶ 45.

According to Palanti, SoloSuit and its co-founders engaged in "unfair and deceptive acts and practices" in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.* at ¶ 39; *see also* 815 Ill. Comp. Stat. 505/2. At times, the theory seems to be that SoloSuit generates answers that do not comply with Illinois pleading requirements. At other times, the theory appears to be that the company does not file answers at all.

For starters, Palanti alleges that SoloSuit "advises persons sued for less than $10,000 in Illinois to file answers, when answers are not required in such cases and filing an appearance operates as a general denial." *See* Cplt., at ¶ 36(a) (Dckt. No. 1-1).

What's more, the answers that SoloSuit generates do "not comply with Illinois pleading requirements and are likely to result in a motion to strike being filed." *Id.* at ¶ 36(b). Allegedly,

5

the answers "include affirmative defenses of laches, waiver, estoppel, unclean hands, and payment without any allegations of facts, as required by Illinois law." *Id.* (cleaned up).

SoloSuit also purports to send the documents "by mail to the Clerk of the Circuit Court" even though "Illinois courts require electronic filing absent a waiver in the specific case." *Id.* at ¶ 36(c). So SoloSuit "represents that a pleading is being filed," even though it isn't, "misleading the consumer into believing that a default has been avoided[.]" *Id.* at ¶ 36(d).

Palanti seeks compensatory damages, punitive damages, and attorney's fees. *Id.* at 9. The complaint does not pin down a damages theory (which it didn't have to do), or a damages amount (same). At first blush, the amount in controversy is up in the air. But the complaint does refer to the possibility that class members will suffer a "default judgment." *Id.* at ¶ 36(d).

Defendants responded by removing the case to federal court under the Class Action Fairness Act. *See* Notice of Removal (Dckt. No. 1). Palanti, in turn, moved to remand the case to state court. *See* Mtn. to Remand (Dckt. No. 10). In her view, CAFA does not come into play because the case falls below the amount-in-controversy threshold.

This Court ordered supplemental briefing on a few questions. In particular, the Court invited the parties to address the apparent mismatch between Plaintiff's own experience and the experiences of the would-be class members. Palanti alleges that class members might have a default judgment entered against them. But thankfully for her, Palanti has avoided that bad outcome by retaining an attorney and defending the case.

The Court asked the parties to explain how the "recovery of damages based on the aggregate amount of default judgments" is "within the realm of possibility, if the named Plaintiff herself did not have a default judgement entered against her." *See* 12/12/23 Order (Dckt. No. 24). This Court also asked Palanti if she disclaimed "once and for all the possibility of

6

recovering damages equal to the amount of a default judgment in state court for each of the potential class members." *Id.*

In response, Palanti argued that "differences in damages do not defeat a class." *See* Pl.'s Resp. to 12/12/23 Order, at ¶ 2 (Dckt. No. 25). Palanti also said that she did not disclaim any damages on behalf of herself or the class, "including damages based on default judgments that may have been entered against class members." *Id.* at ¶ 1.

Palanti added that Defendants should show their work and prove their $5 million estimate. Specifically, Palanti said that Defendants "should provide the list of cases, with numbers and counties, and state whether judgments were entered for each," using the data in Defendants' pocket. *Id.* at ¶ 4.

For their part, Defendants argued that Palanti's class-certification attempt will fail, but noted that this Court's jurisdiction does not hinge on her chances of future success. *See* Defs.' Resp. to 12/12/23 Order, at 2 (Dckt. No. 26). Defendants also pointed out that Palanti has no authority to disclaim damages on behalf of putative class members. *Id.* at 3.

## Legal Standard

A defendant can remove a case to federal court if a plaintiff "could have invoked the original jurisdiction of the federal courts." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (citing 28 U.S.C. § 1441(a)). The party seeking removal has the burden to demonstrate subject matter jurisdiction. *Id.* A party that brings a case to federal court must show that the case belongs in federal court.

If a federal court lacks jurisdiction over the removed case, it must remand the case and ship it back to state court. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

**Analysis**

Article III vests federal courts with the power to hear cases between parties with diverse citizenship. *See Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019). The Constitution itself does not require complete diversity of citizenship. It is enough if anyone on the plaintiff side is diverse from anyone on the defendant side. *See Big Shoulders Cap. LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 571 (7th Cir. 2021).

Congress narrowed the path in the diversity jurisdiction statute. *Id.* ("Although this constitutional grant requires only minimal diversity, the diversity jurisdiction statute, 28 U.S.C. § 1332, requires complete diversity."). Generally speaking, diversity jurisdiction exists only if there is complete diversity of citizenship between the parties on each side of the lawsuit. *See Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021). In other words, no party on the plaintiff's side of the lawsuit can share the same citizenship as a party on the other side of the lawsuit. *Id.*

Congress widened the lane for diversity jurisdiction for class actions in the Class Action Fairness Act. *See Tri-State Water Treatment, Inc. v. Bauer*, 845 F.3d 350, 353 (7th Cir. 2017). Under the Act, a district court has the power to hear a class action when: (1) the class has at least 100 members; (2) any member of the class is a citizen of a different state than any defendant ("minimal diversity"); and (3) the aggregate amount in controversy is more than $5 million. *See Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017); *see also* 28 U.S.C. § 1332(d)(2)(A), (5)(B).

The case at hand satisfies the first two requirements. *See* Notice of Removal, at ¶ 8 (Dckt. No. 1); Mtn. to Remand, at ¶ 19 (Dckt. No. 10). The putative class has over 250 members. *See* Notice of Removal, at ¶ 11. There is minimal diversity, too. *See Roppo*, 869

F.3d at 578. Palanti is a citizen of Illinois, and SoloSuit is a Delaware corporation with its principal place of business in Utah. *See* Notice of Removal, at ¶¶ 13, 14.

The last remaining hurdle is the amount in controversy, which must exceed $5 million. *See* 28 U.S.C. § 1332(d)(2).

Sometimes the parties agree on the amount in controversy. In that case, courts typically accept the agreed-upon estimate, unless there is a good reason not to. *See Roppo*, 869 F.3d at 579; *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court."). A district court always must satisfy itself that it has jurisdiction, even if the parties agree that it's a non-issue. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). If an agreed estimate about the amount in controversy smells fishy, a district court doesn't have to choke it down.

When parties disagree about the amount in controversy, a district court must decide how much is at stake in the lawsuit. Diversity jurisdiction exists only "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds" the jurisdictional threshold.[1] *See* 28 U.S.C. § 1446(c)(2)(B); *see also Dart Cherokee*, 574 U.S. at 88; *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 854 (7th Cir. 2022) ("Where the amount in controversy is contested, removal is proper if the district court finds, by the preponderance of the evidence, that

---

[1] The statute actually says that "removal of the action is proper ... [if] the amount in controversy exceeds the [in excess of $75,000] amount specified in *section 1332(a)*." *See* 28 U.S.C. § 1446(c)(2)(B) (emphasis added). And section 1332(a) imposes an amount-in-controversy threshold of $75,000, not $5 million. Even so, courts have interpreted section 1446(c)(2)(B) to require a district court to make a finding by a preponderance of the evidence whether the amount in controversy exceeds $5 million. *See Dart Cherokee*, 574 U.S. at 88 n.1. It is difficult to read the statute any other way. At the end of the day, a district court has to make a finding about whether the amount in controversy is more than $5 million. Nothing in the Class Action Fairness Act suggests that any standard of proof higher than a preponderance of the evidence should apply.

the amount in controversy exceeds the jurisdictional threshold.") (cleaned up); 16 James Wm. Moore, *et al.*, *Moore's Federal Practice* § 107.91[7] (3d ed. 2023) ("Most courts hold that if challenged with regard to the amount in controversy, a defendant removing under CAFA must prove that the amount exceeds $5 million by a preponderance of the evidence or to a reasonable probability, which amounts to the same thing.").

Sometimes pinning down the amount in controversy requires some digging. The amount in controversy doesn't always leap off the page of the complaint. It is not uncommon for state court complaints to leave a little something to be desired when it comes to the amount in controversy. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006) ("Because Coke is the proponent of jurisdiction, it has the burden of showing by a preponderance of the evidence facts that suggest the amount-in-controversy requirement is met. That is easier said than done when the plaintiff, the master of the complaint, does not want to be in federal court and provides little information about the value of her claims. In such a case, a good-faith estimate of the stakes is acceptable if it is plausible and supported by a preponderance of the evidence.") (internal citations omitted).

In that situation, a "removing party therefore only must establish the amount in controversy by a good faith estimate that is plausible and adequately supported by the evidence." *See Roppo*, 869 F.3d at 579 (cleaned up).

A defendant can meet its burden a few different ways. One option is to calculate the amount in controversy based on the complaint's allegations. Another option is to point to a plaintiff's informal estimates or settlement demands. An additional possibility is to introduce evidence in the form of affidavits from the defendant's employees about how much it would cost to satisfy the plaintiff's demands. *Id.* And so on.

10

"If the removing party is able to meet this burden, then remand is appropriate only if the plaintiff can establish the claim is for less than the requisite amount to a legal certainty." *Id.* (cleaned up); *see also Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 764 (7th Cir. 2011) ("Although there certainly is more that [the defendant] could have done . . . we are satisfied that [the defendant] provided plausible, good-faith estimates demonstrating how the stakes exceed $5,000,000.") (internal citations omitted); *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008) ("Once the proponent of federal jurisdiction has explained plausibly how the stakes exceed $5 million, then the case belongs in federal court unless it is legally impossible for the plaintiff to recover that much.") (cleaned up); 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3709.4 (5th ed. 2023) ("CAFA continues the basic and generally recognized presumption that the plaintiff's good faith allegation of the amount in controversy is accepted unless it appears to a legal certainty that the underlying claim is really for less than the jurisdictional requirement.").

The amount in controversy does not turn on the strength of the case. The question is the amount at issue in the case, not the likely recovery by the plaintiff. Courts must "focus on the phrase 'in controversy,'" "remember the difference between even highly unlikely results and truly impossible results," and "avoid prematurely trying the merits of the case in deciding jurisdiction." *See Schutte*, 28 F.4th at 854 (citation omitted). The question is the amount that a plaintiff could recover, not the amount that a plaintiff is likely to recover.

With those guideposts in mind, this Court "begins with the allegations of the complaint that was removed to federal court." *See Roppo*, 869 F.3d at 580.

Palanti's complaint does not offer much help when pinning down the amount in controversy. The complaint does not specify how many users are in the putative class. The

11

complaint does not address the amount of damages suffered by each user, either. To top it off, the complaint does not include an aggregate demand for damages for the class as a whole. So, an uncertain number of class members are seeking an unknown amount of damages.

At best, the complaint sketches a general outline of the case. But SoloSuit filled in the gaps. The complaint alleges that SoloSuit did not file answers to the complaints, and thus exposed the class members to the possibility of default judgments. *See* Cplt., at ¶ 36(d) (Dckt. No. 1-1). SoloSuit basically takes that allegation, and runs with it.

SoloSuit offered a declaration from Simons (its CEO) declaring that approximately 257 customers in Illinois paid SoloSuit for its services. *See* Simons Declaration, at ¶ 5 (Dckt. No. 1-2). According to Simons, those customers were sued for about $1.9 million in underlying debt. *Id.* at ¶ 6. So, if the class members had default judgments entered against them for $1.9 million, then they could turn around and seek $1.9 million from SoloSuit, too.

Defendants use that $1.9 million figure as the starting point for their calculation of the amount in controversy. *See* Notice of Removal, at ¶ 22 (Dckt. No. 1). As they see it, the class could have suffered compensatory damages totaling $1.9 million if state courts entered default judgments against them because SoloSuit botched the filing of the answers.[2] *Id.*

The complaint doesn't exactly say that the class members have, in fact, had default judgments entered against them. And the complaint doesn't exactly allege that the class will seek damages equal to the amount of any default judgments. Even so, the complaint does allege that SoloSuit hung the class members out to dry, by giving them a false sense of security and

---

[2] Remember, Palanti did not disclaim "any damages on behalf of herself or any class members, including damages based on default judgments that may have been entered against class members." *See* Pl.'s Resp. to 12/12/23 Order, at ¶ 1 (Dckt. No. 25). Palanti doesn't have authority to disclaim damages for the proposed class, anyway. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013) ("[A] plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified.").

exposing them to the risk of a default judgment. That allegation is enough to put the potential amount of the default judgments in the field of play when it comes to the amount in controversy.

And then, Defendants add punitive damages on top. Punitive damages count when calculating the amount in controversy if the underlying statute allows punitive damages. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 512 (7th Cir. 2006). Here, the Illinois Consumer Fraud and Deceptive Business Practices Act does authorize punitive damages. *Id.*; *see also* 815 Ill. Comp. Stat. 505/10a(a). So punitive damages count toward the $5 million threshold.

Illinois courts have affirmed punitive damages awards under the Act reflecting multipliers greater than five. *See Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 275 (7th Cir. 2011). The Supreme Court has also "suggested that a larger (but still single-digit) ratio could be" constitutional. *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).

Doing a little math, Defendants point out that "a multiplier of only three" would get them over the $5 million hurdle, because $1.9 million times three equals $5.7 million in punitive damages. *See* Notice of Removal, at ¶ 25 (Dckt. No. 1). Actually, after doublechecking the math, it looks like a multiplier of two (not three) would suffice. Compensatory damages of $1.9 million, plus double that amount in punitive damages ($3.8 million), equals $5.7 million.[3]

---

[3] Using a multiplier of three seems like the wrong figure. Defendants basically argue that punitive damages, standing alone, would suffice if a multiplier of three applies. The math checks out – $1.9 million times three equals $5.7 million. Still, a plaintiff can't recover punitive damages without compensatory damages. *See Bachman v. General Motors Corp.*, 776 N.E.2d 262, 300 (Ill. App. Ct. 2002) ("Punitive damages are in addition to compensatory damages and cannot be allowed unless actual damage is shown.") (cleaned up). So, there is no scenario where the class could recover $5.7 million in punitive damages but $0 in compensatory damages. That's why a multiplier of two is enough – $1.9 million in compensatory damages plus $3.8 million in punitive damages equals $5.7 million.

Defendants also point out that the statute in question allows for the recovery of attorney's fees. Legal fees can count toward the amount in controversy if a plaintiff has a statutory right to them. *See Webb v. Fin. Indus. Regulatory Auth., Inc.*, 889 F.3d 853, 857 (7th Cir. 2018). And the Consumer Fraud and Deceptive Business Practices Act does authorize attorney's fees, with limited exceptions that aren't relevant here. *See* 815 Ill. Comp. Stat. 505/10a(c).

Defendants don't offer an estimate of the legal fees. *See* Notice of Removal, at ¶ 27 (Dckt. No. 1). The bill can't climb too high, because only fees incurred before removal count. *See ABM Sec. Servs., Inc. v. Davis*, 646 F.3d 475, 479 (7th Cir. 2011). Regardless, Defendants say that the fees sprinkle more dollar bills on top of the amount in controversy sundae. *See* Notice of Removal, at ¶¶ 26–27 (Dckt. No. 1).

Putting it all together, Defendants satisfied their burden of showing that the amount in controversy exceeds $5 million. Compensatory damages could reach $1.9 million, meaning the amount of potential default judgments. The class could recover a multiple of that amount in punitive damages. And they can recover attorney's fees, too. All told, Defendants "explained plausibly how the stakes exceed" the amount-in-controversy threshold. *See ABM Sec. Servs.*, 646 F.3d at 478.

The Seventh Circuit reached a similar outcome in *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568 (7th Cir. 2017). There, a plaintiff filed a putative class action in state court on behalf of "all Illinois persons who made a personal injury motor vehicle claim for accidents" during a certain time frame and who had an insurance company conceal the insured's policy limits. *Id.* at 575 (cleaned up).

The insurance company removed the suit to federal court under CAFA. *Id.* The plaintiff filed a motion to remand, arguing that the insurance company failed to leap over CAFA's amount-in-controversy bar. *Id.* at 576.

For its part, the insurance company used the underlying policy limits to estimate the amount in controversy. *Id.* at 581. It theorized that "if each of the approximately 500 putative class members sought to recover the full value of [the allegedly concealed] umbrella policy, the aggregate damages for the putative class would total over $500 million." *Id.*

The plaintiff argued that the district court "should have required" the insurance company "to establish how many of its insureds' cases involved the fraudulent concealment of the umbrella policy from the claimant." *Id.* at 582 (cleaned up). In other words, the plaintiff wanted the district court to make the insurance company show data proving its estimate. *Id.*

The Seventh Circuit saw no need for more digging. It called the plaintiff's arguments "untenable, given her allegations in the complaint." *Id.* The plaintiff alleged that the insurance company had "an accepted practice" of umbrella coverage misrepresentations, so the Seventh Circuit reasoned that a fact finder "*might* conceivably lawfully award" more than $5 million based on the corresponding math. *Id.* at 582–83 (emphasis in original).

Along the way, the Seventh Circuit noted that a defendant does not have to "confess liability" to "show that the controversy exceeds the threshold." *Id.* at 583 (citing *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008)); *Blomberg*, 639 F.3d at 763 ("The party seeking removal does not need to establish what damages the plaintiff will recover, but only how much is in controversy between the parties. This burden thus 'is a pleading requirement, not a demand for proof.'") (citations omitted). Instead, a defendant can rely on the allegations of the complaint

15

to establish the amount in controversy, even if the defendant believes that the plaintiff should not recover a nickel.

Here, Palanti's complaint alleges that SoloSuit represents to "all Illinois residents" that "a pleading is being filed, when in fact it isn't, thereby misleading the consumer into believing that a default has been avoided, when this is not the case." *See* Cplt., at ¶ 36(d) (Dckt. No. 1-1). Put differently, Palanti says that SoloSuit has a "practice[]" of failing to file lawful answers, so, as a result, its customers do not "avoid[]" default judgments. *Id.* at ¶¶ 36(d), 39; *see also Roppo*, 869 F.3d at 582. At the end of the day, Palanti's complaint puts the possibility of default judgments at issue, which means that they count for purposes of the amount in controversy. *See Spivey*, 528 F.3d at 985–86 ("The complaint also alleges that making unauthorized charges is a standard practice at Vertrue. Spivey's allegations thus put into 'controversy' the propriety of all of Vertrue's charges[.]").

Palanti resists this conclusion. She believes that Defendants should prove their $5 million estimate. In her view, SoloSuit undoubtedly knows how many of the cases in state court ended in default judgments, and for what amounts. *See* Pl.'s Resp. to 12/12/23 Order, at ¶ 4 (Dckt. No. 25) ("Defendants (but not Plaintiff) know what cases are involved . . . . Defendants should provide the list of cases, with numbers and counties, and state whether judgments were entered for each.").

At this point, there is no need to dig deeper into the complaint. Defendants have the burden to show "what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks." *See Spivey*, 528 F.3d at 986 (citation omitted).

16

True, Defendants' "failure to admit" the number of cases with default judgments, and the amount of those default judgments, "makes it uncertain how high the judgment (if any) will be." *Id.* But an uncertainty does not equal an impossibility. *Id.* And this Court can only reject a defendant's plausible estimate if it is legally impossible. *Id.*; *see also Roppo*, 869 F.3d at 579 ("If the removing party is able to meet this burden, then remand is appropriate only if the plaintiff can establish the claim is for less than the requisite amount to a legal certainty.") (cleaned up); *Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 275 (7th Cir. 2011) ("We therefore do not think it is 'legally impossible' for the class to recover more than $3 million in punitive damages. Improbable, perhaps, but not impossible.").

Fighting back, Palanti argues that Defendants offer this Court a forbidden "conclusory invocation of CAFA." *See* Pl.'s Reply, at 2 (Dckt. No. 15) (citation omitted). Conclusory invocations don't carry weight. *See Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 (7th Cir. 2021). But this is not a case where a party "impl[ies] that the amount in controversy is greater than $5 million, but [does] not actually make any specific factual allegations or assertions on that point." *Id.* As the Court discussed, Defendants alleged that the underlying debt connected to the potential class members is $1.9 million – and Defendants connected the relevance of the underlying debt to the allegations in Palanti's complaint.

Charging on, Palanti points to two district court cases where the court rejected a defendant's estimate of the amount in controversy. *See* Pl.'s Reply, at 2–3 (Dckt. No. 15). Those cases do not move the needle.

In *Halim v. Charlotte Tilbury Beauty Inc.*, the district court rejected an estimate of the amount in controversy as pure speculation. *See Halim v. Charlotte Tilbury Beauty Inc.*, 2023 WL 3388898, at *6 (N.D. Ill. 2023). The defendants rooted their calculation in the premise that

17

proposed class members used the defendants' product "at least twice." *Id.* at *4. The district court rejected that premise because the complaint did not allege how many times each proposed class member used the product. *Id.* at *4, *6. Instead, the complaint only alleged that the *named plaintiff* used the product a few times. *Id.* at *4.

If anything, this case involves the opposite situation. Palanti alleges that the class members face a more dire situation than she does, because the class members might have default judgments entered against them. *See* Cplt., at ¶ 36(d) (Dckt. No. 1-1) ("The representations which Defendants make to all Illinois residents concerning its services are deceptive and misleading, in that" SoloSuit "represents that a pleading is being filed, when in fact it isn't, thereby misleading the consumer into believing that a default has been avoided, *when this is not the case*.") (emphasis added). The amount-in-controversy theory is consistent with the complaint, not an expansion of the complaint.

Palanti also reaches for help from *Corn v. Home Depot, Inc.*, but comes up short. *See* Pl.'s Resp., at 3 (Dckt. No. 15). There, the court rejected the defendant's estimate of the amount in controversy. *See Corn v. Home Depot, Inc.*, 22-cv-4627 (Dckt. No. 24, at 7 of 7). First, the court explained that the plaintiff had expressly disavowed damages in his complaint – he only wanted equitable and declaratory relief. *Id.* at 4 of 7. Second, the court noted that even if the plaintiff was seeking damages, defendant's estimate was fatally "unrelated to the claim" that the plaintiff alleged. *Id.*

This case falls somewhere on the other side of the spectrum. Here, the complaint expressly seeks damages. *See* Cplt., at 9 (Dckt. No. 1-1). And the amount in play is more than enough to satisfy the amount in controversy.

18

Finally, Palanti argues that this Court should "presume that the plaintiff may choose his or her forum." *See* Pl.'s Reply, at 4 (Dckt. No. 15) (citation omitted). According to Palanti, "there is a strong presumption in favor of remand." *Id.* (citation omitted).

Palanti misses the target. There is some support in the case law for a "presumption against removal in ordinary diversity jurisdiction cases." *See Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018). But the presumption does not extend to CAFA diversity jurisdiction cases. *See Dart Cherokee*, 574 U.S. at 89 ("[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court.").

And in any event, courts must tread lightly when applying a presumption, and avoid overstepping. A presumption comes into play when the answer is a close call, and a court could go either way. That is, a presumption is an if-in-doubt default rule. A presumption cannot take away a statutory right when the answer is ascertainable. After all, Congress created the right to removal, so courts must be cautious when applying a presumption, and avoid taking away an express statutory right.

At best, a presumption is an added finger on the scale, when the two sides are equally balanced. But here, the scales tip in favor of federal jurisdiction because the complaint plausibly alleges a potential recovery of more than $5 million.

One final note. It doesn't take long to spot a glaring disconnect between the theory behind the amount in controversy (on the one hand) and Palanti's personal experience (on the other). The complaint alleges that the class members face a risk of a default judgment, and according to SoloSuit, the default judgments could reach $1.9 million. But Palanti doesn't face the same risk as the rest of the class, because she escaped a default judgment.

19

By the look of things, there is a mismatch between the damages that the class representative could recover, and the damages that the class could recover. Palanti can't recover damages equal to the amount of a default judgment against her, because there *is no* default judgment entered against her.

That incongruity might impose an obstacle at the class certification stage. Time will tell whether Palanti could serve as an adequate class representative if she can't recover damages sought by the rest of the class.

Even so, the issue at this stage is the amount in controversy, not class certification. The question is whether the "matter in controversy" exceeds $5 million for the "class action" as a whole. *See* 28 U.S.C. § 1332(d)(2). Here, the class itself faces potential liability of more than $5 million in the state court cases, so the complaint satisfies the amount in controversy.

Maybe Palanti isn't an adequate class representative. But if so, maybe someone else could stand in her place. At this point, the issue is whether the class action could lead to a recovery of more than $5 million. And based on the allegations of the complaint, that amount of recovery is within the realm of possibility.

## Conclusion

For the foregoing reasons, Palanti's motion to remand is denied.

Date: January 8, 2024

Steven C. Seeger
United States District Judge